20 N.J. Super. 147 (1952)
89 A.2d 299
JOHN BONDAR, PETITIONER-APPELLEE,
v.
SIMMONS COMPANY, RESPONDENT-APPELLANT.
Superior Court of New Jersey, Union County Court Law Division.
Decided June 7, 1952.
*148 Mr. Mortimer Wald, attorney for petitioner-appellee.
Messrs. O'Brien, Brett & O'Brien (Mr. Thomas J. Brett), attorneys for respondent-appellant.
HETFIELD, J.C.C.
This is an appeal from the determination of the Deputy Director of the Division of Workmen's Compensation awarding the petitioner-appellee, John Bondar, hereinafter referred to as petitioner, compensation for 33 3/7 weeks of temporary disability and compensation for partial permanent disability to the extent of 27 1/2 per cent of total, and against the respondent-appellant, Simmons Company, hereinafter referred to as respondent.
It was stipulated that petitioner was in the employ of respondent on February 7, 1951, that his wages were such as would entitle him to the maximum compensation rate, and that respondent had notice of the alleged accident or injury.
Petitioner alleges that he developed a bursitis of his right shoulder from the work in which he was engaged during the course of his employment with respondent and contends that the alleged bursitis constitutes a "compensable occupational disease" within the meaning of the statute. R.S. 1937, 34:15-31, as amended L. 1949, c. 29, p. 103, Sec. 2.
It is the contention of respondent that petitioner has not sustained the burden of proving the causal relationship between *149 the alleged bursitis and his employment, and that the evidence in the case does not support the finding of the deputy director that petitioner suffered a "compensable occupational disease" as that term is defined in the statute.
The questions presented by this appeal for determination are whether or not petitioner has borne the burden of proving the causal relationship between the alleged bursitis in his right shoulder and the work in which he was engaged during the course of his employment and of establishing that the alleged bursitis of his shoulder constituted a "compensable occupational disease" within the definition of the statute R.S. 1937, 34:15-31, as amended, L. 1949, c. 29, p. 103, Sec. 2.
The testimony adduced at the hearing below discloses that petitioner was 62 years of age and that he was employed by respondent for 23 years. Since 1945 he had been engaged as a filler in the operation of a filling machine used to stuff mattresses and pillows. This machine was motor-driven, but its operation by petitioner necessitated his pushing a lever a distance of less than a foot, and when the filling of the piece was complete, pulling the said lever back again. Petitioner was a piece worker, and it is not disputed that he completed this operation with his right hand between 500 and 700 times in the course of a full working day. The amount of force expended in each operation was described by petitioner's foreman, who was produced as a witness by respondent, as equal to the force which would be necessary to push down a foot clutch on an old-fashioned automobile by hand.
Petitioner was compelled to stop work on February 7, 1951, because of severe pain in his right shoulder and his inability to use his arm. His testimony that his shoulder had been bothering him for about two months prior to February 7, 1951, was corroborated by respondent's own witnesses who stated that petitioner had requested several times to have his job changed so that he would be relieved from pushing the lever on the machine.
*150 Since February 7, 1951, petitioner was attended by several doctors and was a patient at the Memorial Osteopathic Hospital, of Elizabeth, and the Medical Center, at Jersey City. Petitioner's right hand is still swollen so that he cannot make a fist, and he claims that he cannot do the same work he was able to do prior to February 7, 1951.
Dr. Emil Stein, called as a witness on behalf of the petitioner, testified that he examined petitioner on February 7, 1951, which was the same day he stopped working. His examination disclosed no swelling, no bruising and no lacerations, but petitioner complained of intense pain in the shoulder joint and had limited motion of the arm. The doctor made a diagnosis of acute bursitis of the shoulder. X-rays taken at the doctor's request did not show calcium deposits and he expressed no opinion on causal relationship between petitioner's work and the bursitis.
Dr. Calatina Jocson, called as a witness in behalf of petitioner, testified that he operated on petitioner's right shoulder at the Jersey City Medical Center on May 28, 1951. He stated that he did an exploration of the right shoulder and resected the tip of the acromion process and the several ligaments connecting the acromion process and the coracoid process. The exploratory operation disclosed calcific deposits at the tendons of the rotator cuff, and his final diagnosis was degeneration of the rotator cuff, or calcareous tendinitis. It was the doctor's opinion that the degeneration of the rotator cuff tendon was caused by repeated minor trauma aggravating the normal process of degeneration. He stated that when petitioner pushed and pulled the lever of the filling machine the tendon cuff was being impinged upon one side with the head of the humerus and the other side the acromion process and the ligaments within the acromion process and the coracoid process, which the doctor described as "a grinding process that goes on continuously."
Dr. Jacob Heyman, called as a witness in behalf of the petitioner, testified that he examined him on September 28, 1951, and on October 17, 1951. It was the doctor's opinion *151 that petitioner had a sub-deltoid bursitis in association with a supraspinatus tendon involvement and after the operation developed a retrogressed sympathetic dystrophia of the arm manifested by swelling of the palm of the hand, dystrophy of the proximal interphalangeal joint and a shrinking of the biceps tendon. A hypothetical question was submitted to the doctor and he answered that it seemed to him clinically that petitioner suffered repeated traumata of the rotator cuff tendon of the shoulder and that the constant strain, the constant pulling, and particularly with involvement of the supraspinatus tendon, which is part of the rotator cuff, resulted in the tendinitis. He estimated that petitioner was permanently disabled to the extent of 30 per cent of total.
On cross-examination Dr. Heyman admitted that there are thousands of people suffering from bursitis which is related to chronic strain or trauma so minimal that it is not thought of as trauma.
The hospital records of the Jersey City Medical Center which were admitted into evidence contained a history which mentioned that petitioner had slipped on the ice on February 7, 1951, and had fallen on his right side and shoulder. The said history also stated that petitioner had gradual increasing pain in his right shoulder two or three months prior to the alleged fall. Petitioner, under oath, denied that he had experienced a fall; and Dr. Stein, who examined petitioner on February 7, 1951, found no evidence of any external trauma.
Philip G. McAndrew, called as a witness in behalf of respondent, testified that he was assistant personnel manager at the plant and that among his duties he had charge of securing accident reports and claims of injuries by employees. He stated there were four men doing exactly the same work as petitioner and that he had received no complaints from any of them in regard to any condition arising out of the operation of the filling machines.
Daniel Sheehan, Jr., produced as a witness by respondent, testified that he was petitioner's foreman on February 7, *152 1951, and that he had neither received nor heard of any complaints from other employees engaged in the same work as petitioner, or of any adverse physical effect from the operation of said machines by the other employees.
Dr. William B. Ein, produced as a witness by the respondent, testified that he examined petitioner on October 17, 1951, and found him suffering from what is frequently referred to as a frozen shoulder, meaning there are intra-articular adhesions within the joint, interfering with motion. Petitioner also had some arthritic changes in the elbow and forearm and some periarthritic changes in the proximal interphalangeal joints of all the fingers excepting the thumb. It was the doctor's opinion that trauma is not the causative factor in the production of petitioner's condition, as most people past 40 may develop changes in certain parts of the body, and the supraspinatus tendon in the shoulder is the most common part. This condition is a degenerative change in the supraspinatus often referred to as sub-burse or subacromiom bursitis, and in a very few instances has any relation to direct or indirect trauma. Trauma, however, superimposed upon that area will cause pain. The doctor admitted that the question of causal relationship depended upon the history of the case and that he was not familiar with petitioner's allegations. He further admitted that the use of force in pushing a lever could produce the pain suffered by petitioner, depending on the amount of force and the position in which he was when the force was used. It was the doctor's opinion that petitioner was permanently disabled to the extent of 25 per cent of total, exclusive of cause and independent of pathology.
Respondent's contention that the disability of petitioner is the result of trauma sustained in an alleged fall on the ice on February 7, 1951, superimposed upon a degenerative change in the supraspinatus tendon in his shoulder is overcome by the greater weight of the evidence. Although the hospital records of the Jersey City Medical Center contain a history which mentions a fall on the ice on February 7, *153 1951, the same history also mentioned that petitioner suffered a gradually increasing pain in his right shoulder in the two or three months prior to February 7, 1951. Dr. Stein's examination on February 7, 1951, disclosed no evidence of any external trauma, and although petitioner was treated at respondent's plant for the next two weeks succeeding February 7, 1951, no record was produced by respondent to indicate any external trauma. Respondent's own witnesses admit that petitioner requested to be relieved from the operation he was performing on the filling machine about two months prior to February 7, 1951, and petitioner denied, under oath, that he suffered the alleged fall on the ice. The calcific deposits at the tendons of the rotator cuff disclosed in the exploratory operation conclusively show that the condition in the right shoulder of petitioner developed over a long period of time, and the medical proofs preponderate in support of the more probable hypothesis that his disability was caused by repeated minor trauma aggravating the normal process of degeneration of the rotator cuff tendon. The operation of the lever on the filling machine created a "grinding process" within the shoulder whereby petitioner suffered repeated trauma of the rotator cuff tendon resulting in the bursitis and the disability of which he complains.
After a careful consideration of all the evidence it appears to this court that the hypothesis that petitioner's present disability is causally related to his employment with respondent is the more probable hypothesis; and I find as a matter of fact that the disability from which he suffers is the result of the constant use of the lever on his machine over a long period of time.
The remaining question presented by this appeal for determination is whether petitioner has suffered a "compensable occupational disease" within the provisions of the statute R.S. 34:15-31, as amended L. 1949, c. 29, p. 103, Sec. 2.
Prior to January 1, 1950, the statute provided in R.S. 34:15-31 for compensation for a limited number of specifically designated occupational diseases. The Legislature, in *154 L. 1949, c. 29, effective January 1, 1950, defined "compensable occupational disease" to include "all diseases arising out of and in the course of employment, which are due to causes and conditions which are or were characteristic of or peculiar to a particular trade, occupation, process or employment, or which diseases are due to the exposure of any employee to a cause thereof arising out of and in the course of his employment." There can be no question that the Legislature, by eliminating the specifically designated occupational diseases and by using such comprehensive language, intended to broaden the coverage of the prior act by making compensable all occupational diseases which are contracted as a result of exposure hazards in the course of employment.
Our appellate courts, in interpreting the comprehensive language of the statute, R.S. 34:15-31, as amended L. 1949, c. 29, p. 103, Sec. 2, have not as yet decided whether said language used in the act includes bursitis as a compensable occupational disease. However, the State of Michigan has recognized "disability arising from bursitis" and "caused by any process involving continuous rubbing * * * of the parts affected" as a compensable occupational disease which is defined in general by the Michigan statute as "a disease which is due to causes and conditions which are characteristic of or peculiar to a particular trade, occupation, process or employment." Pub. Acts 1937, No. 61, pt. 7, § 1(c).
The Supreme Court of the State of Michigan has passed upon an almost identical factual situation with the case at bar. Kalee v. Dewey Products Co., 296 Mich. 540, 296 N.W. 826, 827 (Sup. Ct. 1941). In the Kalee case the employee worked for nine years. For the first eight years her job consisted of pouring medicine from a graduate into various size bottles which stood on a table and of pasting labels on the bottles. She poured with her right hand. About a year before she became disabled a machine was installed for the job of filling and labeling the bottles. With her right hand the employee placed the bottle on the conveyor which carried it to the machine to be labeled; and after it was *155 labeled she took it off with her left hand, meanwhile putting another bottle on the conveyor with her right hand. Her symptoms started in 1935 and grew progressively worse until she was compelled to stop work in 1939. There was no dispute that the employee was suffering from a chronic or subacute bursitis. As to the cause of the bursitis the court stated:
"There is ample testimony to establish that this condition is due to an over-use of the shoulder in her employment as heretofore detailed. * * * plaintiff's physician testified that there was a constant pressure, rubbing and friction within the shoulder itself and it was this internal rubbing and friction in the rotation of the arm which caused the bursitis."
The court further held that the disease was compensable because the work in which the employee was engaged was an integral part of the process of bottling medicine and that the manner in which it was necessary for her to do her part of the process was as much an incident to her employment as was the work of those who compounded the medicine.
It is the opinion of this court that the comprehensive language of R.S. 34:15-31, as amended, includes disability arising from bursitis when caused in the manner supported by the preponderance of the evidence in the case at bar. The disease and the injury arose out of and in the course of petitioner's employment and was due to the constant repetitious pushing and pulling of the lever of the filling machine with his right arm. This operation was a necessary and an integral part of the process of stuffing mattresses and pillows and a cause or condition which was peculiar to the particular process of manufacturing and a hazard to which petitioner was exposed by virtue of his employment with respondent. Le Lenko v. Wilson H. Lee Co., 128 Conn. 499, 24 A.2d 253 (Sup. Ct. Err. 1942); Stepnowski v. Specific Pharmaceuticals, Inc., 18 N.J. Super. 495 (App. Div. 1952).
Respondent contends that the evidence offered by petitioner in this case is entirely devoid of any proof that a bursitis of *156 the shoulder is characteristic of or peculiar to any occupation or employment in which the arm was used in the same or similar manner to the way he was required to employ his arm in the pursuit of his duties. To support this contention respondent also cites evidence that other employees of respondent doing the same work as petitioner were not affected by the work. It is the respondent's contention that petitioner's bursitis and its resulting disability are not within the generally recognized risks of his employment and that consequently he did not suffer an occupational disease within the meaning of the statute R.S. 34:15-31, as amended.
Respondent's contention is without merit, as there was ample proof that the cause of the bursitis of the shoulder was characteristic of or peculiar to the particular process of manufacturing and a hazard to which petitioner was exposed in his employment with respondent. The fact that the risk of contracting bursitis is "one which has not become generally recognized or because only employees unusually susceptible will suffer from it" does not exclude said disease from compensable occupational diseases as defined in R.S. 34:15-31, as amended. Le Lenko v. Wilson H. Lee Co., supra; Stepnowski v. Specific Pharmaceuticals, Inc., supra.
After a careful study of the transcript of testimony, findings and briefs of counsel, I find and determine that petitioner has sustained the burden of proof in establishing his claim for workmen's compensation pursuant to R.S. 34:15-31, as amended. I find that he is entitled to compensation for temporary disability from February 7, 1951, to September 28, 1951, or 33 3/7 weeks, at $30 a week, in the amount of $1,002.85. I further find that a fair award for his partial permanent disability due to the occupational disease is 27 1/2 per cent of total, entitling him to compensation for 151 1/4 weeks at $30 a week, in the amount of $4,537.50.
It is, therefore, on this 7th day of June, 1952, ordered that judgment be entered in favor of petitioner and against respondent in accordance with the above.
*157 It is further ordered that the following allowances be made:
(a) To petitioner  reimbursement in the sum of $50 on account of medical treatment, payable by the respondent;
(b) To Dr. Emil Stein  $50 for his court appearance and testimony, payable by respondent;
(c) To Dr. Calatina T. Jocson  $50 for his court appearance and testimony, payable by petitioner;
(d) To Dr. Jacob Heyman  $100 for his examination, court appearance and testimony, payable $50 by respondent and $50 by petitioner;
(e) To Dr. Frederick Strauss  $25 for his X-rays and report, payable by petitioner;
(f) To Mortimer Wald, Esq., attorney for petitioner  a counsel fee of $900, payable $500 by respondent, and $400 by petitioner;
(g) Stenographic costs shall be paid by respondent.
It is further ordered that the stenographic fees on the appeal be assessed against respondent, and that respondent pay to petitioner's attorney, Mortimer Wald, Esq., a counsel fee on this appeal in the amount of $400; and that petitioner pay a counsel fee of $300 on this appeal to his attorney, Mortimer Wald, Esq.